**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

TBS Properties LLC,

          Plaintiff,

v.

United States of America,

          Defendant.

No. CV-20-00195-PHX-DWL

**ORDER**

## INTRODUCTION

For nearly 30 years, various members of the Perry family have owned restaurant franchises in the greater Phoenix area.  Each individual restaurant (there are a total of 13) is an S-corporation.  Additionally, the real property on which each restaurant is located is held by an LLC (there are another 13).  Initially, Raymond and Donna Perry held the S-corporations and LLCs directly, but other members of the Perry family now hold them via a pair of trusts.

Between 2015 and 2017, Raedon Enterprises, Inc. ("Raedon"), which is the S-corporation associated with the Perrys' Burger King franchise in Scottsdale, amassed over $150,000 in tax liabilities.  Afterward, the United States placed a lien on the real property where Raedon does business.  That property is owned by one of the Perrys' LLCs, TBS Properties, LLC ("TBS"), which acquired the property from Raymond and Donna Perry in 1998 and began leasing it to Raedon in 2000, via an unsigned lease agreement.

In this action, TBS seeks to quiet title to the encumbered property.  (Doc. 1.)  In

response, the United States asserted a counterclaim seeking a declaration that TBS may be held responsible for Raedon's debts pursuant to any of three theories: (1) fraudulent transfer, (2) alter ego, and/or (3) nominee.  (Doc. 21.)  Now pending before the Court is TBS's motion for summary judgment.  (Doc. 63.)  For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

I.    Factual And Procedural History.

The facts summarized below, and detailed throughout this order, are taken from the parties' summary judgment submissions and other documents in the record.  The facts are uncontroverted unless otherwise noted.

During their lifetimes, Raymond and Donna Perry owned seven Burger King restaurants and six Arriba Mexican Grill restaurants in the Phoenix area.  (Doc. 66-1 at 73-75 ¶¶ 5, 7, 12.)  At relevant times, all 13 restaurants were S-corporations.  (*Id.* at 75 ¶ 12.)

The real property on which each restaurant is located is owned by an LLC.  (*Id.* at 74 ¶ 7 ["Each of the 13 related restaurants operated from a property . . . owned by a related LLC that solely held title to the property."].)  Jest Enterprises, Inc. ("Jest") serves as the management company for all 26 of the S-corporations and LLCs.  (Doc. 63-14 at 1; Doc. 63-15 at 9; Doc. 66-1 at 75 ¶ 13.)

One of the S-corporations is Raedon, which was formed on January 24, 1985.  (Doc. 63-6 at 1-19.)

One of the LLCs is TBS, which was formed on June 23, 1997.  (Doc. 63-5 at 1-10.)

On March 23, 1998, TBS acquired an ownership interest in the real property at issue (the "Subject Property") via a warranty deed.  (Doc. 63-2 at 1-3.)  The grantors of the warranty deed were Raymond and Donna Perry.  (*Id.* at 1.)

On June 30, 2000, TBS and Raedon entered into a twenty-year triple-net lease for the Subject Property.  (Doc. 63-3 at 1-15.)  The only version of the lease that is part of the record is unsigned.  (*Id.*)

Sometime in 2012, upon the deaths of Raymond and Donna Perry, the Perry Marital

Trust ("Marital Trust") and the Perry Family Trust ("Family Trust") were formed.  (Doc. 63-12 at 1-23.)  The Marital Trust now owns the 13 LLCs and the Family Trust now owns the 13 S-corporations.  (Doc. 63-15 at 3; Doc. 66-1 at 10-12.)

Between 2015 and 2017, Raedon amassed over $150,000 in tax liabilities.  (Doc. 63-1 at 2.)

On November 14, 2019, the United States filed a Notice of Federal Tax lien against the Subject Property, asserting that TBS held the property as a nominee for the benefit of Raedon.  (*Id.*)  At the time, the Subject Property was being leased by Raedon pursuant to its 2000 lease agreement with TBS.  (Doc. 63-3 at 3; Doc. 63-15 at 12.)  The property has since been leased by TBS to an unrelated company, And Go Concepts, LLC.  (Doc. 63-4.)

On January 27, 2020, TBS initiated this action by filing a complaint to quiet title to the Subject Property.  (Doc. 1.)

On May 20, 2020, the United States filed an answer to the complaint and a counterclaim against TBS, Raedon, the Family Trust, the Marital Trust, and Jest.[1]  (Doc. 21.)

On August 6, 2021, TBS moved for summary judgment.  (Doc. 63.)

On September 20, 2021, the United States filed a response.  (Doc. 66.)

On October 12, 2021, TBS filed a reply.  (Doc. 69.)

On February 28, 2022, the Court issued a tentative ruling.  (Doc. 73.)

On March 10, 2022, the Court heard oral argument.  (Doc. 74.)

## DISCUSSION

In its complaint, TBS seeks a "judicial determination and order that [the United States] has no lien interest or any other interest in or against the Subject Property."  (Doc. 1 at 5.)  The United States, in turn, seeks a declaratory judgment that its lien encumbers the Subject Property nominally owned by TBS based on three theories: (1) TBS, in coordination with Raedon, Jest, the Family Trust, and the Marital Trust, engaged in

---

[1]     The United States also named Captain Kelt, LLC as a counter-defendant, but this entity was later dismissed pursuant to the parties' stipulation.  (Doc. 42.)

fraudulent property transfers, rendering TBS's interest in the property voidable; (2) alternatively, TBS is the alter ego of Raedon; or (3) further alternatively, TBS is the nominee of Raedon.  (Doc. 21 at 13-15.)  Each theory is addressed below.

I.    Summary Judgment Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The Court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id.* at 1103.  Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

II.   Fraudulent Transfer

    A.   **The Parties' Arguments**

In a pretrial disclosure statement, the United States asserted that it is "entitled to collect Raedon's tax liabilities from any of the property of Jest, the Perry Family Trust, or the Marital Trust" under Arizona's Uniform Fraudulent Transfer Act ("UFTA") because "[t]he transfer of [the Subject Property's] nominal title" to TBS "was made without receiving reasonably equivalent value" and "the persons and entities that presently control both Raedon and [TBS] intended to incur . . . debts beyond their ability to pay as they became due."  (Doc. 63-16 at 3-4.  *See also* Doc. 21 at ¶¶ 36-41.)

In its summary judgment motion, TBS argues the UFTA is inapplicable here "because Raedon never owned the Subject Property, nor did it transfer it to TBS."  (Doc. 63 at 6-7.)  TBS contends that, before a creditor may use the UFTA as a remedial measure, "the debtor must first have acquired rights in the assets transferred, and then the debtor must have made a transfer."  (*Id.*)  TBS argues that "[n]either conditions precedent are met in this case" because Raedon simply leased the Subject Property from TBS and never held an ownership interest in the Subject Property.  (*Id.*)  TBS also notes that it obtained the Subject Property in 1998, "nearly 20 years before Raedon incurred the debt alleged by the United States."  (*Id.*)

Based on its response to TBS's summary judgment motion, it is unclear whether the United States continues to view the UFTA as providing an independent pathway to relief in this case.  Most of the response is spent addressing the viability of alter ego (Doc. 66 at 8-12) and nominee (*id.* at 12-14) liability, which the United States identifies as its two theories for using TBS's property to satisfy debts owed by Raedon (*id.* at 7).  In contrast, the United States suggests that the concept of fraudulent transfers is relevant here simply because "the structure and operation of the entities at issue demonstrate a pattern and practice of fraudulent transfers."  (*Id.*)  Finally, in response to TBS's contention that the UTFA is inapplicable because Raedon never owned or transferred the Subject Property, the United States argues that "because all of the entities were operated as a single-

enterprise, first owned and controlled by the Perrys and second owned and controlled by the trusts, there was in effect a transfer between Raedon and TBS." (*Id.* at 15.)

In reply, TBS contends that the United States "[c]onced[es] that Raedon never owned the Subject Property and could not have fraudulently transferred it to TBS." (Doc. 69 at 9-10.) TBS also contends that the circumstances of the transfer of the Subject Property from Raymond and Donna Perry to TBS in 1998 are inconsistent with a fraudulent transfer theory because the Perrys were not debtors at that time (they passed away in 2012 and Raedon's liabilities did not arise until 2015) and they received consideration in exchange for the transfer (the sole membership interest in TBS). (*Id.* at 10-11.)

B.     **Analysis**

To the extent the United States is seeking to assert an interest in the Subject Property based solely on a fraudulent transfer theory, TBS is entitled to summary judgment on that claim for the simple reason that there was no transfer of the Subject Property by Raedon. The UFTA provides, in relevant part, that "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor[,] [or] [w]ithout receiving a reasonably equivalent value in exchange for the transfer . . . , and the debtor . . . [i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." A.R.S. § 44-1004(A). Under the statute, "debtor" means "a person who is liable on a claim"; "property" means "anything that may be the subject of ownership"; and "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." *Id.* § 44-1001(5), (8)-(9).

Here, rather than argue that there was a transfer of the Subject Property by Raedon (as the debtor) to TBS, the United States merely points to a broader series of allegedly fraudulent transfers involving the Perrys, the Marital Trust, the Family Trust, Jest, the LLCs, and the S-corporations. But even assuming those transfers could be shown to be

1    fraudulent within the meaning of the UFTA, the United States does not explain why the

2    existence of other fraudulent transfers by different entities involving different pieces of

3    property would be relevant in analyzing whether the law of fraudulent transfer (as opposed

4    to the law of alter ego liability) would give rise to a claim against property held by TBS to

5    satisfy a debt owed by Raedon.

6        The decision in *Armed Forces Bank NA v. Dragoo*, 2018 WL 8621584 (D. Ariz.

7    2018), which the United States cited during oral argument, does not compel a different

8    result.  There, a couple placed certain property into a trust in 1996 and then had a $7 million

9    judgment entered against them in 2011.  *Id.* at *1.  Around the time the $7 million liability

10   arose, the trust created a new "Paymaster arrangement" under which it would send $10,000

11   each month to an Arizona law firm that would, in turn, use the money to pay the couple's

12   personal expenses.  *Id.*  In *Armed Forces Bank*, one of the questions was whether the

13   creditor holding the $7 million judgment could rely on the law of fraudulent transfer to

14   obtain recourse.  *Id.* at *2-4.  Critically, the judgment creditor was "not alleging the

15   [couple] committed fraudulent transfers when establishing the trust in 1996.  Instead, the

16   allegedly fraudulent transfers [were] those occurring in connection with the Paymaster

17   arrangement."  *Id.* at *2.  Given this understanding, the court denied the couple's motion

18   to dismiss the fraudulent transfer claim.  *Id.* at *3.

19       If the United States were seeking to rely on the UFTA to challenge specific transfers

20   of money from Raedon to TBS that occurred after Raedon incurred its tax liabilities (or

21   even in anticipation of the creation of those liabilities), *Armed Forces Bank* might support

22   the United States' position.  But that is not the United States' theory—as noted, the United

23   States seeks to rely on the UFTA to challenge the transfer of the Subject Property from the

24   Perrys to TBS in 1997, nearly two decades before the liabilities arose.  Nothing in *Armed*

25   *Forces Bank* suggests the UFTA would apply to such a transfer.

26       . . .

27       . . .

28       . . .

III.   Alter Ego

A.   **The Parties' Arguments**

The United States next seeks relief under an alter ego theory.  In their briefs, both sides eventually agree that, regardless of whether state or federal law is deemed applicable here, the United States must prove two elements to establish alter ego liability: (1) unity of control; and (2) that observance of the corporate form would sanction fraud or promote injustice.  (Doc. 63 at 8-12; Doc. 66 at 9-10; Doc. 69 at 4.)

TBS argues that summary judgment is warranted because the United States cannot satisfy either element.  (Doc. 63 at 7-12.)  As for unity of control, TBS argues that, of the relevant factors identified by Arizona courts, only one (common officers or directors) is present here.  (Doc. 63 at 7-8.)  As for fraud and injustice, TBS contends that "[t]here is no evidence that TBS was used in any way other than as a landlord of its property. . . .  When Raedon made [a rent] payment directly, the expense was recorded as an expense and a reduction in Raedon's cash in its books, and when Jest made the payment on behalf of Raedon, it was recorded as an expense and an increase in a due to Jest account.  As a disregarded entity, TBS reported its operations, including the rent earned from Raedon, on the Marital Trust's tax returns, and the Marital Trust paid tax on the earnings.  There was no commingling of assets between the different companies that are managed by Jest and owned by the Family Trust and Marital Trust."  (*Id.* at 8-12.)

In response, the United States argues that summary judgment should be denied due to the presence of disputed issues of fact.  (Doc. 66 at 8-12.)  As for unity of control, the United States argues that the following facts support a finding of unity: (1) the absence of an executed lease agreement between TBS and Raedon; (2) the uncontested fact that "the Perrys controlled all the entities prior to their respective deaths" and, afterward, "Steve Morales, primarily, and Nicole Perry are the two co-trustees of the two trusts and, therefore, control . . . all 27 entities owned by the two trusts"; (3) the fact that "[b]oth Steve Morales and Mark Morales referred to working for the 'family business'"; (4) Steve Morales's concession that he does not "know[] how the finances of the 'family business' work"; (5)

the inability by Steve Morales and others to "explain the reason for or the mechanics of the corporate form"; (6) evidence that "[t]he accounts for the companies had numerous transfers for which [there are] no formal agreements, interest, or reconciliation"; (7) evidence that "Steve and Mark Morales have deposited company checks into their personal accounts"; (8) evidence that "[n]one of these companies followed corporate formalities," as shown by the absence of board meetings; and (9) the fact that "Steve Morales and Nicole Perry borrowed against TBS's sole asset to pay tax liabilities related to a different entity." (*Id.*) The United States summarizes: "Throughout the 'family business,' there are common officers, directors and ownership. There is failure to maintain corporate formality, a lack of corporate separateness, and a lack of knowledge about the purported corporate separateness. There are interest-free loans, confusing and unreconciled financial records, and the commingling of corporate and personal funds. There is a lack of board meetings. As such, the United States has shown that there is a unity of control." (*Id.* at 11-12.) As for the remaining element of the alter ego test, the United States argues that "to allow TBS and its related companies to use the corporate form to shirk responsibilities for unpaid tax would promote injustice and frustrate the United States' rights. The paper structure of these entities is an attempt to strip the liabilities of the operations of the company from the assets with sufficient value to recover those liabilities." (*Id.*)

In reply, TBS reiterates its position that the only unity-of-control factor present here is the existence of common officers and directors, which alone is insufficient to establish an alter ego relationship. (Doc. 69 at 4-9.) As for the United States' contention that other factors are present, TBS contends that the United States relies on unsupported assertions and inadmissible evidence. (*Id.*) For example, as for the alleged lack of corporate formalities, TBS contends that the United States' sole proffered example is the failure to hold board meetings, but because TBS, the Family Trust, and the Marital Trust are all LLCs, they do not have boards of directors that could hold such meetings (and were not, in any event, required to hold such meetings under Arizona law). (*Id.* at 5.) As for the alleged lack of corporate separateness, TBS contends that the United States "fails to allege

any facts in support of its conclusory statement" and that other evidence in the record affirmatively demonstrates the *existence* of corporate separateness, including Jest's allocation of expenses among the separate entities for which it performed services and the recording of intercompany transactions.  (*Id.* at 5-6.)  As for the alleged lack of knowledge of corporate separateness, TBS contends that the deposition testimony of Steve and Mark Morales demonstrates that each was able to "fully explain[] the different entities and their roles."  (*Id.* at 6-7.)  As for the alleged presence of interest-free loans, TBS contends that the only purported evidence of such loans consists of "self-serving statements by an IRS revenue officer that are inadmissible hearsay"; notes that the relevant portion of the revenue officer's declaration ("My review of the financial records revealed frequent and inexplicable transfers of funds between the various corporate accounts.") is devoid of specifics; and asserts that "[t]he entities' controller, Patrick Knutson, who has personal knowledge as to the accounting transactions of the entities, testified as to the proper recording of the transactions."  (*Id.* at 7-8.)  As for the alleged presence of confusing and unreconciled financial records, TBS again contends that this is a conclusory allegation unsupported by any evidence and that the entities' controller testified to the contrary.  (*Id.* at 8.)  As for the alleged commingling of corporate and personal funds, TBS contends that the IRS revenue officer's assertions on this point amount to "inadmissible hearsay" and that other evidence in the record affirmatively establishes the absence of commingling.  (*Id.* at 8-9.)  Finally, as for the second alter ego element, TBS contends that it has not promoted or perpetuated fraud because "[t]here is no evidence to suggest that TBS was formed to thwart Raedon's liabilities that were incurred nearly 17 years [after TBS was formed] when its Burger King location could not survive."  (*Id.* at 9.)

B.   **Analysis**

"A corporation will be treated as a separate entity unless sufficient reason appears to disregard the corporate form.  But when [an entity] is merely [another entity's] alter ego and when observing the corporate form would work an injustice, a court may properly 'pierce the corporate veil.' . . .  This 'alter ego' status exists when such unity of interest

and ownership exists that the separate personalities of the corporations cease to exist.  Thus, to establish that [an entity] is liable under the alter-ego theory, [a plaintiff] must show that unity of control exists and that observance of the corporate form would sanction a fraud or promote injustice." *Keg Restaurants Ariz., Inc. v. Jones*, 375 P.3d 1173, 1182 (Ariz. Ct. App. 2016) (citations omitted).  "Corporate status, however, is not lightly disregarded." *In re Keesling*, 2012 WL 5868883, *2 (D. Ariz. 2012) (citing *Chapman v. Field*, 602 P.2d 481, 483 (Ariz. 1979)).  "The actions of the corporation and owners must be so closely intermixed such as to justify finding a merger of identities." *Id.* (cleaned up).[2]

### 1.   Unity Of Control

"Unity of control exists when the parent corporation exercises substantially total control over the management and activities of the subsidiary. . . .  Factors proving 'substantially total control' include common officers or directors, the parent's financing of the subsidiary, the parent's payment of the subsidiary's salaries and other expenses, the subsidiary's failure to maintain formalities of separate corporate existence, the similarity of the parent's and the subsidiary's logos, and the opposing parties' lack of knowledge of the subsidiary's separate corporate existence."  *Keg Restaurants*, 375 P.3d at 1182 (citations omitted).  *See also Deutsche Credit Corp. v. Case Power & Equipment Co.*, 876 P.2d 1190, 1195-96 (Ariz. Ct. App. 1994) ("Arizona decisions have identified the following considerations, among others, as material to this issue: common officers or directors; payment of salaries and other expenses of subsidiary by parent (or of corporation

---

[2]     Although many Arizona decisions involve attempts to use the alter-ego doctrine to hold a parent corporation liable for a subsidiary's debts, the doctrine also appears to be potentially applicable when, as here, the entities do not share a parent/subsidiary relationship. *Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 1 Cal. Rptr. 2d 301, 317-18 (Cal. Ct. App. 1991) ("A very numerous and growing class of cases wherein the corporate entity is disregarded is that wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation. . . .  [U]nder the single-enterprise rule, liability can be found between sister companies.") (citations and internal quotation marks omitted); *U.S. Bank Nat. Assoc. v. Starr Pass Resort Developments LLC*, 2019 WL 2237471, *15 (Ariz. Ct. App. 2019) ("We do not find the single-enterprise rule to be substantively inconsistent with Arizona's alter-ego liability law.  Consequently, it is unnecessary for us here to adopt the single-enterprise rule as may be employed in other jurisdictions.") (citing *Las Palmas*, 1 Cal. Rptr. 2d at 317-18).

by shareholders); failure to maintain formalities of separate corporate existence; similarity of corporate logos; plaintiff's lack of knowledge of separate corporate existence; owners' making of interest-free loans to corporation; maintaining of corporate financial records; commingling of personal and corporate funds; diversion of corporate property for shareholders' personal use; observance of formalities of corporate meetings; intermixing of shareholders' actions with those of corporation; and filing of corporate income tax returns and ACC annual reports.").

Although the issue presents a close call (in large part due to the conclusory nature of much of the evidence the United States chose to submit in opposition to TBS's motion), the Court concludes there is enough evidence that, when construed in the light most favorable to the United States, could support a finding in the United States' favor on the unity-of-control element of the alter ego test.  Thus, TBS is not entitled to summary judgment on that issue.

As for the factors that cut in the United States' favor, first, it is undisputed that TBS and Raedon were owned and controlled by common officers and directors.  Both sides agree this weighs in favor of finding unity of control.

Second, the unsigned nature of the lease between Raedon and TBS (which TBS never attempts to defend in its motion papers) could be viewed by a rational factfinder as an indication of unity of control.  Although the parties do not identify any cases that touch on this issue, it stands to reason that truly separate entities would insist that the key contract governing their business relationship be properly signed and executed.

Third, the deposition testimony of Patrick Knutson could be construed by a reasonable factfinder as demonstrating a lack of corporate separateness.  Since 2014, Knutson has overseen Jest's "account and financials."  (Doc. 66-1 at 58.)  During his deposition, Knutson stated that it is "common for Jest to transfer funds in-between" the various entities it oversees and that Jest might do so simply because one entity was "light on cash" and a different entity "had excess cash."  (*Id.* at 63.)  Knutson further stated that Jest does not create "loan agreements" or other "official paperwork" when engaging in

these sorts of entity-to-entity transfers—instead, he "just book[s] it into the system."  (*Id.* at 64.)  Finally, Knutson stated that Jest does not ensure that entity-to-entity transfers are repaid.  (*Id.* at 66 [Q: "What happens with those book entries, meaning are they ever reconciled; at the end of the year, does . . . Jest . . . make payments to even out these accounts?"  A: "The reconciliations yes, . . . I go through and I match them up, but the payouts . . . , No.  You don't bring it back to zero, no."].)  Such transactions weigh in favor of finding unity of control.  *Cf. Bird v. DJO LLC*, 2020 WL 1083774, \*4 (D. Ariz. 2020) ("To establish unity of control, Defendant lists . . . several unexplained transfers from Bird Medical's bank account to Plaintiff's personal account . . . [and that] Plaintiff wrote off payments for his family vehicle as a business expense.  The Court finds that, viewing the evidence in the light most favorable to Defendant, Defendant has set forth sufficient evidence to raise a genuine issue of material fact as to the unity of control between Plaintiff and Bird Medical.").[3]

On the other hand, several other factors—including factors the United States asks the Court to place on its side of the ledger—weigh against a finding of unity of control. For example, although the United States proffers the deposition testimony of Mark and Steve Morales as evidence of a lack of knowledge of corporate separateness, a close review of the testimony supports the opposite conclusion.  The only relevant things Mark Morales admitted to not knowing were how the trusts worked (Doc. 66-1 at 47 ["Well, I don't really understand exactly how it works.  That's why I have a trust attorney."]), and how the Perrys originally entered into franchise agreements with the restaurants (*id.* at 49).  Otherwise, Mark Morales provided a fairly comprehensive grasp of the different entities and their varied roles, explaining that the restaurants are managed by Jest, the restaurants operate on

---

[3]    The tentative order stated that, in light of TBS's "evidence that Jest still allocates expenses among the different entities it manages and records intercompany transactions," the lack-of-separateness factor weighed against the United States.  During oral argument, the United States disputed this point by emphasizing Knutson's deposition testimony.  The Court was persuaded by this discussion and thus now concludes that, when applying summary judgment standards and construing disputed evidence in the light most favorable to the United States as the non-movant, the lack-of-separateness factor favors the United States rather than TBS.

1    separate physical properties, and the properties themselves are owned by distinct LLCs.

2    (*Id.* at 44-46, 49-50.)

3          Similarly, although the United States asserts that the lack of corporate formalities

4    weighs in its favor, the United States' proffered evidence on this point consists of the

5    absence of board meetings.  But because TBS—the entity the United States wishes to show

6    is an alter ego of Raedon, such that TBS's assets are considered fair game for paying

7    Raedon's debts—is an LLC, it is not required to have a board of directors or hold board

8    meetings.  *See* A.R.S. § 29-3201.  *See generally* Mirit Eyal-Cohen, *Through the Lens of*

9    *Innovation*, 43 Fla. St. U. L. Rev. 951, 998 n.295 (2016) ("Unless otherwise specified in

10   an operating agreement, LLC rules do not require carrying annual meetings, board of

11   directors meetings, shareholders meetings, corporate minutes, and so on.").

12         Finally, assessing the applicability of several other unity-of-control factors is

13   complicated by evidentiary issues.  For example, although the United States asserts that

14   there is a unity of control in part due to "the commingling of corporate and personal funds"

15   (Doc. 66 at 12), the only evidence proffered in support of this assertion is the declaration

16   of the IRS revenue agent, the relevant paragraph of which reads as follows: "My review of

17   banking records also revealed that both Mark and Steve Morales had deposited company

18   checks in their individual accounts."  (Doc. 66-1 at 76 ¶ 22.)  TBS raises various objections

19   to the admissibility of this assertion, and although it is true that evidentiary defects such as

20   hearsay are not fatal at summary judgment if the evidence may be presented at trial in an

21   admissible form, *see, e.g.*, *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir.

22   2021), the revenue officer's challenged assertion is so vague and non-specific as to be

23   practically devoid of meaning.  Which "company" was involved?  How large was the

24   check?  How many checks were there?  When did the deposits occur?[4]

25         Again, with respect to the United States' contention that "[t]here are interest-free

26

27   _____

     [4]      During oral argument, the United States explained that it made "a tactical decision
28   . . . to not create an overly voluminous declaration" that might be confusing.  Although the
     Court appreciates not being flooded with thousands of pages of unnecessary documents at
     summary judgment, the approach here erred on the side of brevity.

loans [and] confusing and unreconciled financial records" (Doc. 66 at 12), the evidence proffered in support of this contention is the revenue officer's avowal that she "reviewed various records of the entities that were given to me by Jest personnel as well as numerous bank records collected by subpoena" and "[m]y review of the financial records revealed frequent and inexplicable transfers of funds between the various corporate accounts.  These transfers amongst these accounts were done without any loan agreements.  I found no evidence that any interest was paid from one company to another.  While entries may have been made on a balance sheet, I saw no evidence that transfers were ever reconciled." (Doc. 66-1 ¶¶ 14-15.)  TBS objects to the admissibility of this portion of the revenue officer's declaration and the Court is again sympathetic to TBS's objections due to the revenue officer's reliance on generalities and failure to provide specifics.

Although the Court acknowledges the strength of TBS's evidentiary objections, it is ultimately unnecessary to resolve those objections because, even if the disputed evidence were disregarded, the United States' remaining evidence (including its evidence regarding common officers and directors, the absence of a signed lease, and the transfers between entities) would be sufficient to create a triable issue of fact on the issue of unity of control. "Given the diversity of corporate structures and the range of factual settings in which unjust or inequitable results are alleged, it is not surprising that no uniform standard exists for determining whether a corporation is simply the alter ego of its owners."  *Valley Fin., Inc. v. United States*, 629 F.2d 162, 172 (D.C. Cir. 1980).  *See also Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387, 1391-92 (9th Cir. 1993) ("[P]iercing the corporate veil is an equitable remedy used to curb injustices resulting from the improper use of a corporate entity.  Because the remedy is equitable, no concrete formula exists under which a court will disregard the separate identity of the corporate entity.  Use of this remedy depends entirely upon the circumstances of each case.") (quoting *Hando v. PPG Indus., Inc.*, 771 P.2d 956, 960 (Mont. 1989)).  This is an issue best resolved at trial after weighing the evidence and resolving disputed inferences.

…

2.      Fraud Or Injustice

The second prong of the alter-ego test requires a showing of "fraud or injustice." Arizona courts have stated that "[a] fraud or injustice arises if observance of the corporate form would confuse the opposing parties and frustrate their efforts to protect their rights, while allowing the party responsible to evade liability."  *Keg Restaurants*, 375 P.3d at 1184.

Here, the United States' description of its theory of liability during oral argument suggests it is pursuing an "injustice" claim—that is, a claim that it would be unjust to allow Raedon to escape its tax liabilities under the circumstances.[5]  Thus, to survive summary judgment, the United States need not proffer evidence of outright fraud.  *See, e.g.*, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) ("[U]nder an alter ego theory, there is no requirement of a showing of fraud."); *Gourdine v. Karl Storz Endoscopy-Am., Inc.*, 223 F. Supp. 3d 475, 491-92 (D.S.C. 2016) ("Equity is the most important consideration.  But a showing of fraud or wrongdoing is not necessary; rather, it is sufficient that it *appear* that recognition of the acts as those of a corporation only will produce inequitable results.  The inequity, however, must flow from the misuse of the corporate form.") (citations and quotation marks omitted).[6]

As for the showing that is required to prove "injustice," Arizona courts have acknowledged that "[t]he term injustice . . . is not easy to define.  Injustice falls within the realm of equity and has been interpreted as . . . reluctan[ce] to permit a wrong to be suffered

---

[5]      Specifically, the United States stated during oral argument that TBS's counsel was "over simplif[ying] the issue to some degree in saying that the debt alone creates the injustice" and clarified that "[w]e are talking about an appendage to a larger enterprise . . . .  Their books and payments are all controlled by people at Jest.  The funds are transferred around the various accounts at Jest with impunity and not reconciled. . . .  It is that all of the money that comes out of these restaurants is put effectively into an account at Jest and then transferred at will to wherever Jest needed to put that money to cover other bills. . . .  And the net result of all of this is that tax liabilities that should rightfully be able to be paid from one company . . . are not going to be paid because [the money to pay the liability] went to some other liability within the family of companies and any outstanding book balance has not been reconciled."

[6]      During oral argument, TBS identified *Employer's Liability Assurance Corp. v. Lunt*, 313 P.2d 393 (Ariz. 1957), as the best case supporting its "fraud or injustice" arguments. However, that case involved a "fraud" claim, not the sort of "injustice" claim the United States is pursuing here.

without remedy.  It seeks to do justice and is not bound by strict common law rules or the absence of precedents.  It looks to the substance rather than form.  It will not sanction an unconscionable result merely because it may have been brought about by means which simulate legality.  And once rightfully possessed of a case it will not relinquish it short of doing complete justice."  *Youngren v. Rezzonico*, 543 P.2d 142, 144 (Ariz. Ct. App. 1975) (citation omitted).

In the tentative order, the Court concluded the United States had proffered sufficient evidence to create a triable issue of fact as to the injustice prong because "the fact that a judgment against Raedon would remain unsatisfied is sufficient to establish an inequitable result and promote injustice." (Doc. 73 at 16.)  During oral argument, TBS challenged this conclusion, arguing that more is required to establish injustice because, otherwise, the second prong of the alter-ego test "would be essentially meaningless."  Having now re-reviewed the cases cited in the parties' summary judgment papers and conducted additional research, the Court acknowledges that the law in this area is difficult to reconcile.  On the one hand, there are Ninth Circuit and Arizona cases that suggest the existence of an unpaid tax or other liability would, alone, be sufficient to establish injustice under the second prong of the alter-ego test.  *See, e.g.*, *Towe*, 999 F.2d at 1391 ("Courts have not hesitated to ignore the fiction of separateness and approve a piercing of the corporate veil when the corporate device frustrates clear intendment of the law.  The Government's inability otherwise to satisfy legitimate tax debts clearly may form a sound basis for such disregard of corporate form.") (citation and internal quotation marks omitted); *Cammon Consultants Corp. v. Day*, 889 P.2d 24, 26-27 (Ariz. Ct. App. 1994) ("[T]o recognize Cammon as a corporate entity separate and distinct from Justus would work an injustice in this case. Appellee Day holds, as successor in interest, a lien of approximately $200,000 on the parcels.  If foreclosure of the tax liens were permitted, Day's lien would be extinguished and Justus, through Cammon, would have the parcels free and clear of the $200,000 lien without paying anything to satisfy it.").  On the other hand, courts have also recognized the logic of TBS's redundancy argument.  *See, e.g.*, *Sea-Land Servs., Inc. v. Pepper Source*,

941 F.2d 519, 522-24 (7th Cir. 1991) ("But what, exactly, does 'promote injustice' mean, and how does one establish it on summary judgment?  These are the critical, troublesome questions in this case.  To start with, . . . 'promote injustice' means something less than an affirmative showing of fraud—but how much less? . . .  The prospect of an unsatisfied judgment looms in every veil-piercing action; why else would a plaintiff bring such an action?  Thus, if an unsatisfied judgment is enough for the 'promote injustice' feature of the test, then *every* plaintiff will pass on that score, and [the two-part test] collapses into a one-step 'unity of interest and ownership' test.").

The Court finds it unnecessary to wade into the debate here because, even assuming that something more than an unsatisfied tax lien or judgment is required to prove "injustice" for purposes of the second prong of the alter-ego test, the United States has proffered evidence of additional unjust considerations here.  As discussed above, the deposition testimony of Knutson, when construed in the light most favorable to the United States, suggests that money was transferred from Raedon to other entities within the Jest umbrella simply because Raedon had excess cash and the other entities needed money.  Although it is unfortunate that the United States did not submit more detail about the timing and amount of these transfers—as TBS's counsel pointed out during oral argument, it may be possible to construe Knutson's testimony as benign in the absence of such details—the Court concludes that allowing Raedon's tax liabilities to go unpaid in the face of such transfers would, indeed, result in "injustice" as that term is construed by Arizona courts.

IV.   Nominee

A.   **The Parties' Arguments**

TBS argues that the United States' final theory of liability is unavailing because Arizona does not recognize nominee liability.  (Doc. 63 at 12-13.)[7]  In a related vein, TBS

---

[7]     TBS also argues that, to the extent the United States' nominee theory can be construed as an argument for a constructive trust under Arizona law, such a theory must fail because it "did not obtain title to its property from Raedon, nor did it obtain it through fraud, misrepresentation, concealment, undue influence, or duress, and therefore, it does not hold the property in constructive trust for the benefit of Raedon, Jest, the Family Trust, or the Marital trust."  (Doc. 63 at 13.)  Because the United States is not pursuing a constructive trust claim, but instead points to case law addressing nominee liability, the

contends that the Ninth Circuit case on which the United States relies, *Fourth Investment LP v. United States*, 720 F.3d 1058 (9th Cir. 2013), is inapposite because it applied California law, not Arizona law, and—per that case—"[s]tate law provides the substantive rules of the nominee doctrine." (*Id.*)  For similar reasons, TBS argues that *Towe Antique Ford Foundation v. IRS*, 999 F.2d 1387 (9th Cir. 1993), is inapposite because it applied Montana law.  (*Id.*)

In response, the United States acknowledges that "no Arizona state court has expressly approved of the nominee theory" but contends the Court should do so here because "the United States District Court in Arizona has explicitly adopted the theory," "[t]he Supreme Court and the Ninth Circuit have expressly approved the nominee theory as well," and "[i]t is difficult to imagine that Arizona is the sole place in the United States where one may freely use a nominee to avoid the payment of federal taxes." (Doc. 66 at 14.)  More broadly, the United States urges the Court to recognize nominee liability because "[f]ederal tax liens are exceptionally broad, reaching every property interest belonging to the taxpayer . . . [and] [i]t is well-established that a federal tax lien attaches to property held by a taxpayer's nominee." (*Id.* at 12-13.)

In reply, TBS reasserts that Arizona does not contemplate nominee liability and then argues, in the alternative, that even if the Court were to apply the nominee factors used by other courts, "TBS is not a nominee of Raedon because Raedon did not transfer the Subject Property to TBS.  The cases that the United States relies on address situations in which *transferees* were alleged to be a nominee of a *transferor*," but that is inapplicable here because Raedon never owned—and thus never transferred—the property to TBS.  (Doc. 69 at 11-12.)

B.    **Analysis**

The sole ground on which TBS moved for summary judgment is that nominee liability is categorically unavailable as a matter of Arizona law.  (Doc. 63 at 12-13.)  Although TBS also asserted, in its reply, that the United States would not be able to prevail

---

Court does not construe its argument as one for a constructive trust.

on a nominee claim as a factual matter (Doc. 69 at 11-12), a "district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). This rule applies with particular force in the summary judgment context. *See* S. Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 170-71 (2021) ("Moving parties are expected to put all of their arguments . . . in the opening brief . . . [and] aren't supposed to include new arguments . . . in their reply briefs."); *Fried v. Surrey Vacation Resorts, Inc.*, 2010 WL 2330272, *1 (W.D. Wisc. 2010) ("[T]he movant in a summary judgment motion cannot introduce new . . . arguments in its reply materials."). *Cf.* Fed. R. Civ. P. 56(f)(2) (district court may grant summary judgment "on grounds not raised by a party" only "[a]fter giving notice and a reasonable time to respond"). Thus, even though TBS has identified reasons why the United States may face an uphill climb during future stages of this case when pursuing a nominee claim, the only issue now before the Court is whether such a claim is potentially viable under Arizona law.

The Court agrees with the United States that nominee liability is potentially available. In *Fourth Investment LP*, the Ninth Circuit explained that "[t]he IRS has broad powers to impose federal tax liens under 26 U.S.C. § 6321" and that such powers "apply to all property of a taxpayer, including property that is held by a third party as the taxpayer's nominee." 720 F.3d at 1066. The court further noted that, "[a]lthough the Supreme Court has clearly indicated that the IRS may impose nominee tax liens, it has provided only limited guidance concerning how such nominee determinations are to be made." *Id.* at 1066-67 (citation omitted). On that issue, the government in *Fourth Investment LP* argued that the nominee determination should be governed by federal common law so as to prevent "state courts [from] constru[ing] their own nominee doctrines in such a way as to frustrate specific objectives of the federal government," but the Ninth Circuit rejected this concern as unfounded "because state law nominee doctrine is typically so similar to its federal common law counterpart that the distinction is of little moment" and "because courts across many jurisdictions [a]lmost universally utilize the same criteria in evaluating nominee relationships." *Id.* at 1068 (cleaned up).

Although *Fourth Investment LP* does not definitively resolve whether Arizona would allow the imposition of nominee tax liens, that court's observations about the ubiquity of the applicable standards in this area are difficult to reconcile with the notion that Arizona has somehow secretly and unilaterally opted out of the entire nominee tax lien regime.   And notably, although the parties agree that no Arizona state-court decision explicitly endorses or adopts nominee liability, TBS has not identified any Arizona state-court decision disavowing that theory.   Given this backdrop, and in light of the fact that many other judges of this Court have entertained nominee tax-lien claims in recent decades despite the lack of explicit guidance in Arizona law,[8] the Court declines to break new ground and hold that such liens are categorically unavailable under Arizona law.

Accordingly,

**IT IS ORDERED** that TBS's motion for summary judgment (Doc. 63) is **granted in part and denied in part**.

Dated this 15th day of March, 2022.

Dominic W. Lanza
United States District Judge

---

[8]       *See, e.g.*, *United States v. Reading*, 2012 WL 4120439, *6 (D. Ariz. 2012) (acknowledging that "[t]he parties did not cite, and the court did not find, any Arizona case which discusses factors relevant to determining whether a trust is a nominee of an individual" but still recognizing that "the IRS can properly regard Fox Group Trust's assets as the Readings' property, subject to a lien in favor of the United States, if Fox Group Trust is a nominee of James and Clare Reading"); *United States v. Richardson*, 2006 WL 3388347, *6 & n.3 (D. Ariz. 2006) (acknowledging that "[t]he Court has not found any reported Arizona decisions which address the issue of what factors are relevant in determining whether an individual is a nominee of a taxpayer" before holding that "[i]n seeking to satisfy legitimate tax debts, the government may levy on property held by an individual who is merely the nominee of the taxpayer") (citations and internal quotation marks omitted).   *See also United States v. Bigley*, 2017 WL 2417911, *8 (D. Ariz. 2017) ("[P]laintiff seeks to foreclose federal tax liens as to the subject property. . . . A federal tax lien attaches to property held by a taxpayer's nominee.").